# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

EDWARD DAVID,

      Plaintiff

v.

DR. JOHN DOE, et. al.,

      Defendants

Case No.: 3:17-cv-00540-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 53, 61

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 53, 53-1.) Plaintiff filed a response. (ECF No. 55.) Defendants filed a reply. (ECF No. 58.) Despite previously filing a response to the motion for summary judgment, Plaintiff subsequently filed a motion "made to oppose the defendant's motion for summary judgment" where he seeks an order denying Defendants' motion. (ECF No. 61.) Defendants filed a response to that document. (ECF No. 62.)

After a thorough review, it is recommended that Defendants' motion be granted, and that Plaintiff's motion for an order denying Defendants' motion be denied.

## I. BACKGROUND

When he filed his pro se civil rights complaint under 42 U.S.C. § 1983, Plaintiff was an inmate in the custody of the Nevada Department of Corrections (NDOC), but the events giving rise to this action took place while he was a pretrial detainee at the Washoe County

Detention Facility (WCDF). (Am. Compl., ECF No. 37.) He was housed at various facilities within NDOC, and according to NDOC's online offender database was paroled, and then recently filed a notice of change of address indicating he is currently housed at the WCDF again. Defendants are Jimmy Groves, LPN; Sandra Boxx-Fontes, LPN; Suzanna Goodman-Fisler, LPN; and Eloy Ituarte, M.D.

On screening, Plaintiff was allowed to proceed with a Fourteenth Amendment due process claim of inadequate medical care by a pretrial detainee. All other claims were dismissed. (ECF No. 10.)

Plaintiff alleges that on May 15, 2017, he was bit by a snake while at a friend's home, but was not concerned because the snake was not poisonous. On May 17, 2017, he awoke in his hotel room at the Sands Casino and his hand was swollen to the size of a baseball. He was concerned about his hand, and decided to seek medical treatment at a hospital. On his way, an officer stopped him for illegally crossing the street. He had a warrant out for probation violations, and he was arrested and taken to WCDF. He alleges that he informed medical staff on his arrival of his swollen hand. He avers that a WCDF employee said she could not do anything for him, and he would have to file a kite to receive medical treatment. He continued to complain about his swollen hand, but alleges that he received no medical attention.

After a week of being in pain and not being scheduled to see a healthcare provider, he resorted to threats of suicide to seek medical treatment. He expressed concern that the swelling was getting worse, but nursing staff stated he had not been bitten by a snake. Nurses Sandra Boxx-Fontes and Suzanna Goodman-Fisler treated him with hand soaks and Silvadene cream. Nurse Jimmie Groves also treated him for his swollen hand. His hand condition continued to deteriorate, and at this point he asked to be taken to a hospital or to see an orthopedic doctor.

1    Plaintiff saw Dr. Ituarte, who took him off penicillin and prescribed Tramadol. Plaintiff

2    asked Dr. Ituarte if he needed to go to the hospital, and Dr. Ituarte said no, we will just keep it

3    clean with day to day hand soaks and new hand wraps.

4    Plaintiff was transferred to the custody of NDOC on June 14, 2017. He was seen by

5    medical staff for his swollen hand, and was rushed to the hospital where he had his thumb

6    amputated from the first knuckle to the nail. He asserts he was placed on antibiotics to keep him

7    from losing his entire thumb, and also sustained permanent nerve damage in the infected area.

8    Defendants move for summary judgment, arguing that they did not violate Plaintiffs

9    Fourteenth Amendment rights because they provided Plaintiff with objectively reasonable and

10    adequate medical care.

11    **II. LEGAL STANDARD**

12    The legal standard governing this motion is well settled: a party is entitled to summary

13    judgment when "the movant shows that there is no genuine issue as to any material fact and the

14    movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

15    *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

16    evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

17    *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

18    of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary

19    judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

20    other hand, where reasonable minds could differ on the material facts at issue, summary

21    judgment is not appropriate. *Anderson*, 477 U.S. at 250.

22    "The purpose of summary judgment is to avoid unnecessary trials when there is no

23    dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Facts**

On May 17, 2017, emergency medical technician (EMT) Jarred Stallcop performed a receiving screening of Plaintiff, and took his vitals. Plaintiff was not observed to need emergency medical treatment due to any injury, and it was noted that he denied any injuries, open wounds or infections. He had a history of PTSD, bipolar disorder and schizophrenia. He also had a history of daily heroine and alcohol use. (ECF No. 53-1 at 5-10.)

On May 19, 2017, Kelly Ryun, RN, performed an intake assessment, physical assessment, detoxification screening, a mental health assessment, and assessed Plaintiff as needing to be admitted to the clinical opioid withdrawal scale (COWS) protocol for periodic assessment and treatment of symptoms from withdrawal from heroine. He was to be given cool fluids of electrolyte solution three times a day, and had been ordered acetaminophen,

Promethazine, Dicyclomine, and Loperamide. She completed a form indicating Plaintiff was oriented as to person, place, time and station; had appropriate appearance, behavior and perception; and, he was alert with appropriate affect and a cooperative demeanor. She noted no new physical injuries or wounds. He did not have a fever. He denied any issues. He reported experiencing headaches, nausea/vomiting/diarrhea, and hallucinations. It was noted that he was exhibiting minimal opiate withdrawal symptoms. His COWS score was a 4 (minimal withdrawal symptoms; consider reassessing within eight hours, Clonidine not indicated). He did report severe diffuse aching of joints/muscles. He complained of pain in his left finger. He was able to move it and there was no discernable deformity of any kind. There was no redness or edema, the skin was intact. He asked for a wrap for it, but that was denied because it was not medically necessary. Nurse Ryun also noted that Plaintiff asked for a breathing treatment, and his lungs were assessed and were clear and his breathing was at a regular rate with no audible wheezing or coughing, and he had no obvious signs of discomfort or distress. (ECF No. 53-1 at 16-44.)

On May 19, 2017, Porsche Hill, LPN, completed a COWS assessment. Plaintiff complained of nausea and mild diffuse joint pain. The total COWS score was 3, indicating minimal withdrawal symptoms.

On May 20, 2010, Jennifer Villareal, RN, completed a COWS assessment. Plaintiff complained of mild diffuse joint pain. The total COWS score was 2, indicating minimal withdrawal symptoms. The same day, Ms. Hill completed another COWS assessment. Plaintiff complained of stomach cramps. His COWS score was 2. That same day, he also saw Janna Sailors, LPN, and he reported pain in his left hand that had been ongoing for one week. The plan was for him to receive acetaminophen for pain.

On May 21, 2017, Plaintiff presented to Gina Latta, RN, and complained of numbness and pain in his left thumb for three to four days. There were no signs of deformities, bruising or abrasion. (ECF No. 53-1 at 42.)

Plaintiff also presented to Nicole Schifferdecker, RN, and was taken to the infirmary on May 21, 2017, after making statements to deputies about wanting to hurt himself. His left thumb was swollen, and he stated that it did not itch and there was no visible bug bite. He denied hurting himself. He was given medication for pain, and it was noted he would continue to be monitored. (ECF No. 53-1 at 42.)

On May 22, 2017, Plaintiff was seen for a psychiatric evaluation by Angelene Lawrence, MD, after being placed on suicide watch. He said: "I was bitten by something, my hand hurts, nobody would listen so I had to call a mand own." He explained that he was suicidal because he wanted to be seen for his hand pain. He appeared to have some discomfort in the hand. He reported that it was swollen, but there was no evidence of change in size. Dr. Lawrence concluded there was no indication for mental health treatment, but as Plaintiff mentioned medical complaints for his hand, he would be examined before being returned to general population. (ECF No. 53-1 at 64, 69.)

On May 25, 2017, Plaintiff was placed on suicide watch again. When the suicide watch was discontinued the falling day, it was noted that Plaintiff said, he just wanted someone to look at his hand. (ECF No. 53-1 at 85.)

On May 25, 2017, Rebecca Privetta, RN, noted that Plaintiff had told the housing unit deputy that he was short of breath. His vitals were taken, and no breathing treatment was given. (ECF No. 53-1 at 42.)

On May 26, 2017, Plaintiff went to the infirmary complaining of chest pain. His EKG showed sinus tachycardia with no abnormalities. He was given his nighttime medications and told him he was probable experiencing anxiety. In addition, it was noted that his left hand was quite swollen, and painful to light touch. (ECF No. 53-1 at 42.) Jennifer Snidow, NP, prescribed Cephalexin.

Plaintiff saw Suzanne Goodman Fisler, LPN, on May 27, 2017, and she noted that the left hand edema had increased and was hard and extremely painful to touch. His temperature was 100 degrees. He was crying out in pain. (ECF No. 53-1 at 42.)

Plaintiff also saw Jennifer Snidow, NP, on May 27, 2017, for cellulitis on the left hand, which was quite edematous and hot to the touch. He was started on Keflex the night before, and was given a shot of Rocephin that day and Doxycycline was added. He was to continue to be monitored. (ECF No. 53-1 at 42.)

Plaintiff was seen by Janna Sailors, LPN, on May 28, 2017.  He was given acetaminophen for swelling in the left hand causing him pain.  (ECF No. 53-1 at 92-94.)

On May 30, 2017, Plaintiff sent a medical inquiry, stating that his hand had been swollen since May 15, 2017, because he was bitten by a snake that day. He indicated that the medicine he had been given saw not taking away the pain or swelling. He asked for his hand to be cut open so the puss could flow out, and to be seen for his hand. (ECF No. 53-1 at 95.) He received a response that a medical appointment was made. (*Id*.)

Plaintiff sent another medical inquiry on June 1, 2017, asking to be seen for his hand because the medicine was not working. He also asked for a double mattress and pillow to help elevate his hand. Sailors told him in response that an appointment was scheduled with the doctor

about his hand, and he could ask the doctor about ordering a pillow and/or mattress. (ECF No. 53-1 at 96.)

Plaintiff saw Kandice Schultz, NP, on June 2, 2017, for a follow up on his cellulitis of the hand. Plaintiff reported he was bit by a spider, but also told her and others he was bitten by a snake prior to incarceration. The hand was quite swollen, but soft that day. The area with cellulitis was outlined and it would continue to be monitored daily. He was told to keep the hand elevated to help with the swelling. He was treated with Rocephin and Keflex. (ECF No. 53-1 at 41- 42.)

Plaintiff saw Suzanne Goodman Fisler, LPM, on June 2, 2017, and she noted the left hand remained edematous, but less compared to his last check on May 27, 2017. There was no pitting edema, but the area was painful to touch. He appeared unable to move the left thumb, and it was unclear if the pain was causing the non-movement. The area was warm to the touch. The edematous area was outlined in black marking pen, and he was to be scheduled with J. Snidow, NP, on June 3, 2017, for a follow up. (ECF No. 53-1 at 41.)

Plaintiff saw seen by Jennifer Snidow, NP, on June 3, 2017, for a follow up to his May 27th visit. The left thumb cellulitis from the snake bite ("or spider bite depending on who he speaks to") worsened, and he was having a lot of pain. The left thumb was extremely edematous. He was placed on Augmentin and Bactrim, and Tramadol for the pain. He was also given hydrocortisone cream for the itching, and he continued to be monitored. (ECF No. 53-1 at 41.)

Gina Latta, RN, completed wound care on June 6, 2017. The skin was warm, and there was scant/small bleeding. (ECF No. 53-1 at 98-100.)

Plaintiff saw Dr. Ituarte on June 6, 2017, for complaints of skin hanging from his left thumb and hand. It was noted that Plaintiff had been bitten by a snake on the left thumb on May 15, 2017, and was treated with antibiotics and nursing staff sent him for further attention for folds of skin handing from the left thumb and hand. The thumb was mildly swollen without acute signs of active inflammation. He had some pain in the thumb and hand and was taking Tramadol for analgesia, but it was not working as well as Tylenol. He was also taking Bactrim and Augmentin. The left distal thumb showed post inflammatory changes with thickening of the skin. There were several small open wounds at the base of the thumb, with no active bleeding. He had large flaps of dead skin covering the left thumb. After soaking for ten minutes, the dead skin was cut away. There was a band of hyperpigmentation at the base of the Thenar eminence. He was assessed with debridement of epidermis from the left thumb and hand from a snake bite on May 15. The plan was to administer daily wound care from nursing staff, soak the hand 10-15 minutes a day for five days, take acetaminophen for pain, as well as Tramadol, a multivitamin, apply Silvadene to tender skin at the base of the left thumb, do daily dressing changes, and re-check on June 9, 2017. He was educated about pain management and wound care plans. (ECF No. 53-1 at 40-41.)

Janet Needham, RN, completed wound care on June 7, 2017. It was indicated that he had burning pain with hotness and numbness. (ECF No. 53-1 at 101-103.)

Kandice Schultz, NP, ordered, and Suzanne Goodman-Fisler, LPN, administered a tetanus shot for the snake bite on June 8, 2017. (ECF No. 53-1 at 40.) Goodman-Fisler also completed wound care. The skin was dry and there was no bleeding. There was purulent discharge. (ECF No. 53-1 at 104-106.)

Suzanna Goodman-Fisler completed wound care on June 9, 2017. Plaintiff had stabbing pain, and the skin was warm, with purulent discharge. (ECF No. 53-1 at 107-109.)

Plaintiff was also seen by Dr. Ituarte on June 9, 2017. It was again noted that he had an injury to his left hand, but had changed stories with several different interviewers or neglected to mention the mechanism of injury during treatment encounters with nursing staff. Most recently he had stated he was bitten by a boa constrictor on the left thumb while playing with it. He was on antibiotic therapy. He reported that the left hand throbbed, especially at night. He had poor feeling in the distal left thumb. The night before, the thumb drained brown purulent liquid. Warm soaks made his hand feel better. Large amounts of dead skin were debrided from the left thumb the prior Tuesday morning. He received a tetanus booster the day before. On examination that day, the left thumb had dark discoloration under the nail without demonstrable distal capillary refilling. The soft tissue swelling in the thumb and hand had markedly subsided in the prior three days. Compression of the distal digit was painful. He was assessed as having gangrene setting into the distal and mid-portion of the left thumb, and cellulitis from a snake bite from a boa constrictor. The plan was to order an offsite consult, x-ray the left thumb and hand ASAP, continue daily soaks and dressing changes as well as antibiotic therapy. (ECF No. 53-1 at 39-40.)

Janna Sailors, LPN, completed wound care on June 10, 2017. He had radiating and stabbing pain. His skin color was pale, and warm. There was scant/small bleeding. (ECF No. 53-1 at 110-112.) Sandra Boxx, LPN, completed wound care on June 11, 2017. (ECF No. 53-1 at 116-118.) Jimmy Groves, LPN, completed wound care on June 12, 2017. His hand skin was peeling off and this was worrying him. Plaintiff stated that he popped a blister on his thumb and "smelly stuff" came out. He was advised not to mess with his thumb. Groves applied Silvadene to the wound and was wrapped with Kerlix. (ECF No. 53-1 at 119-121.)

1    An x-ray of the left hand was taken on June 12, 2017. There was no fracture, dislocation

2  or other acute abnormalities, but there was a soft tissue injury of the distal aspect of the left

3  thumb. (ECF No. 53-1 at 97.)

4    Jimmy Groves, LPN, completed wound care on June 13, 2017. He convinced Plaintiff to

5  soak the hand. Silvadene cream was applied and secured with Kerlix. Plaintiff was noted as

6  moving his left thumb in the soaking. (ECF No. 53-1 at 122-124.)

7    On June 13, 2017, he was pending an NDOC transfer, and his patient summary was sent

8  to the agency. (ECF No. 53-1 at 39.) He was to be seen by Jimmy Groves, LPN, and was told to

9  have a seat while waiting for Groves to finish with another patient and he took his bandage off

10  by himself, without instructions to do so. Groves asked him to have medical take care of the

11  dressing, and not to do it himself. He apparently refused to have his left hand soaked, and would

12  not sign a refusal form and requested to be sent to the hospital immediately. (*Id.*) Groves

13  completed wound care. Groves noted the physician was aware the distal portion of the left thumb

14  was black in color. He was able to move the left thumb with pain. He did not have a fever.

15  Plaintiff was to continue to be monitored.  (ECF No. 53-1 at 125-128.)

16    Plaintiff was transferred to the NDOC on June 14, 2017. He was seen in the infirmary,

17  and had an IV placed and his dressed changed. (ECF No. 55 at 33.) The next day, on June 15,

18  2017, Plaintiff was sent to the emergency room regarding a snake bite on his left thumb and

19  increased pain and swelling. (ECF No. 55 at 35.) Plaintiff was admitted to Carson Tahoe

20  Regional Hospital on June 15, 2017. He reported being bitten by a snake, and being cared for at

21  the WCDF infirmary with several different oral antibiotics, but he had increased drainage and

22  swelling. He had moderate throbbing pain, redness and swelling, as well as blistering to the

23  dorsal left thumb.  He was put Vancomycin and Unsay via IV. An MRI was ordered and Plaintiff

had a consult with an orthopedic surgeon. The MRI showed osteomyelitis in the proximal

phalanx of the thumb. His diagnoses included osteomyelitis (bone infection) and abscess in the

left hand, and infection with methicillin resistant Staphylococcus aureus (MRSA). The surgeon

decided to partially amputate the thumb, and then have Plaintiff continue on a 6-week course of

IV antibiotics to see if they could avoid amputating the rest of the thumb. (ECF No. 55 at 61-

115.)

Plaintiff returned to NDOC on June 19, 2017, and was admitted to the infirmary to

receive long-term IV antibiotics.

**B. 14th Amendment Standard**

The Ninth Circuit previously applied the Eighth Amendment deliberate indifference

standard to medical care claims brought by pretrial detainees. *Gibson v. County of Washoe*, 290

F.3d 1175, 1187 (9th Cir. 2002) (the Fourteenth Amendment "imposes, at a minimum, the same

duty the Eighth Amendment imposes: persons in custody have the established right to not have

officials remain deliberately indifferent to their serious medical needs"). The Eighth Amendment

deliberate indifference standard applied to convicted prisoners has both an objective and

subjective component. The objective component is whether the medical need is sufficiently

serious. The subjective component is whether the defendant knew of and disregarded an

excessive risk to the inmate's health or safety. *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th

Cir. 1992), *revved on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997);

*see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012).

In *Gordon v. County of Orange*, the Ninth Circuit concluded that "claims for violations of

the right to adequate medical care brought by pretrial detainees against individuals under the

Fourteenth Amendment must be evaluated under an objective deliberate indifference standard[.]"

888 F.3d 1118, 1124-25 (9th Cir. 2018)(quotation marks and citation omitted).  The elements

are:

> (i) the defendant made an intentional decision with respect to the
> conditions under which the plaintiff was confined; (ii) those
> conditions put the plaintiff at substantial risk of suffering serious
> harm; (iii) the defendant did not take reasonable available
> measures to abate that risk, even though a reasonable official in the
> circumstances would have appreciated the high degree of risk
> involved-making the consequences of the defendant's conduct
> obvious; and (iv) by not taking such measures, the defendant
> caused the plaintiff's injuries. ... With respect to the third element,
> the conduct must be objectively unreasonable, a test that will
> necessarily turn[ ] on the facts and circumstances of each particular
> case.

*Id*. (citation and internal quotation marks omitted).

"The mere lack of due care by a state official does not deprive an individual of life,

liberty, or property under the Fourteenth Amendment." *Id*.  at 1125 (citation and quotation marks

omitted). "Thus, the plaintiff must prove more than negligence but less than subjective intent—

something akin to reckless disregard." *Id*. (citation and quotation marks omitted).

**C. Analysis**

Defendants present the expert medical opinion of Kim S. Erlich, M.D., who is a

physician licensed to practice in California, and is a consultant in infectious disease in a private

practice in California. He is board certified in internal medicine and infectious diseases, and a

fellow in the Infectious Diseases Society of America; an Associate Clinical Professor of

Medicine at the University of California, San Francisco; and, Medical Director of the Infection

Prevention and Control and Antibiotic Stewardship at Mills Peninsula Medical Center in

Burlingame, California. (ECF No. 53-1 at 135.) Dr. Erlich reviewed Plaintiff's medical records

from the WCDF, and opines that the care Plaintiff received was within the standard of care

because: once he began complaining of hand pain, he was attended to and evaluated properly at

14

WCDF; as a result of his complaints, he was seen and medically evaluated multiple times by several nurses and a physician on May 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, and June 2, 3, 6, 7, 8, 9, 10, 11, 12, 13 and 14; each time he was evaluated he was interviewed, and his symptomatic hand was examined and physical findings were recorded; he received multiple treatments including several courses of antibiotics (Cephalexin, Doxycycline, Augmentin, and Bactrim) continuously from May 26, 2017 through June 9, 2017, an intramuscular injection of a long acting injectable antibiotic (Ceftriaxone), pain medications (acetaminophen and Tramadol); as well as local wound care, including soaking of the affected hand, and topical application of Silvadene cream. He opines that this treatment was within the standard of care in the management of a patient with cellulitis of the hand. Dr. Erlich states that the efficacy of the treatment depends on the underlying cause of the cellulitis and extent of infection, and depending on the cause, extent and location of the infection, cellulitis of the hand can progress despite appropriate and optimal treatment. In addition, cellulitis due to MRSA can progress to result in tissue destruction, bone infection, and the need for amputation despite appropriate and optimal treatment. Dr. Erlich opines that Plaintiff's medical complaints were not ignored, but he received timely and appropriate treatment. (ECF No. 53-1 at 141-42.)

Defendants have produced expert medical opinion evidence that Defendants' acted within the standard of care in treating an individual with cellulitis of the hand. He was treated with several different oral antibiotics, as well as pain medication, topical treatments and continuous wound care. Plaintiff presents no evidence to the contrary. Plaintiff presents evidence that once he was taken to NDOC, he was taken to the hospital and given a consultation with an orthopedic surgeon; however, Defendants present evidence that at the time Plaintiff was pending transfer to NDOC there was a pending order for a consultation with an orthopedic surgeon. Furthermore,

while the treatment provided ultimately was not able to stop the progression of the infection, not only is there no evidence in the record the Defendants violated the appropriate standard of care, there is no evidence in the record that Defendants acted in reckless disregard of a risk to Plaintiff's health when, according to Dr. Erlich, cellulitis due to MRSA may still progress, even to the point of bone infection requiring amputation, despite appropriate and optimal treatment.

Other courts have confirmed in the Eighth Amendment context that treatment of a MRSA skin infection with wound care and antibiotics is appropriate. *Shepherd v. Cal. Forensic Med. Grp.*, No. 2:15-cv-1894 KJN P, 2017 WL 3491848, at * 6-7 (E.D. Cal. Aug. 14, 2017) ( no Eighth Amendment violation where the plaintiff received wound care for multiple skin infections, topical solutions and antibiotics); *Cunningham v. Belleque*, No. CV-03-1239-MO, 2006 WL 468377, at *3 (D. Or. Feb. 24, 2006) (refusal to provide inmate with Linezolid to treat MRSA did not violate Eighth Amendment); *Ramirez v. Dayalan*, No. C 08-3766 WHA (PR), 2010 WL 3636215, at *2 (N.D. Cal. Sept. 14, 2010) ("an MRSA infection on the skin of the type plaintiff suffered may be treated more conservatively with warm soaks and or drainage, or more aggressively with antibiotics" and finding prison officials did not violate Eighth Amendment when they failed to perform lab tests on boils they suspected were the result of MRSA when they took his history, evaluated his symptoms and ordered antibiotics).

In the absence of evidence that Defendants acted with reckless disregard to Plaintiff's health, summary judgment should be granted in Defendants' favor.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 53), and **DENYING** Plaintiff's motion for an order denying Defendants' motion (ECF No. 61).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 10, 2019

William G. Cobb
United States Magistrate Judge